SO ORDERED.

SIGNED this 10th day of December, 2012.



_Dale L. Somers_
Dale L. Somers
United States Bankruptcy Judge

_____

**Opinion designated for on-line use but not for print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re: | |
| **ALTERNATE FUELS, INC.,** | **CASE NO. 09-20173** |
| | **CHAPTER 11** |
| DEBTOR. | |
| **CHRISTOPHER J. REDMOND,**<br>Trustee, | |
| PLAINTIFF, | |
| v. | **ADV. NO. 11-6026** |
| **WILLIAM KARL JENKINS,**<br>**M. EARLENE JENKINS, and**<br>**CIMARRON ENERGY COMPANY,**<br>**LLC,** | |
| DEFENDANTS. | |

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART THE**

**TRUSTEE'S COMPLAINT REGARDING THE PROOF OF CLAIM FILED BY DEFENDANTS WILLIAM KARL JENKINS AND M. EARLENE JENKINS.**

The allegations of the Trustee's Complaint are before the Court for decision following trial held on August 9, 10, and 14, 2012. The Plaintiff, Christopher J. Redmond, Chapter 11 Trustee of Debtor Alternate Fuels, Inc. (AFI), appeared in person and through his counsel, Glen Smith of Husch Blackwell, LLC. William Quitmeier and Kelly Malm of the Quitmeier Law Firm appeared on behalf of Defendants William Karl Jenkins (W.K. Jenkins) and M. Earlene Jenkins, collectively the Jenkinses or Defendants. W.K. Jenkins appeared in person, but M. Earlene Jenkins did not appear. Defendant Cimarron Energy Company, LLC (Cimarron), did not appear at trial. The parties stipulated to the jurisdiction of the Court over the claims in this adversary proceeding, and consented to the trial and entry of a final order by this Court.[1]

I.    **The Jenkinses' Interest in AFI and their Claim Against the Estate.**

Debtor AFI formerly was engaged in coal mining operations. On December 6, 1999, after mining operations had ceased but when AFI was obligated to reclaim the properties on which mining had occurred, the Jenkinses purchased all of the outstanding shares of stock of AFI, certain equipment, and certificates of deposit which were subject to assignments to the State of Missouri to secure AFI's reclamation obligations. AFI had no assets, no ongoing business, and the funds to operate the business were supplied by the Jenkinses. AFI executed notes in favor of the Jenkinses for such funds. AFI, through

---

[1] Dkt. 63 at 2.

2

Cimarron, using the funds provided by the Jenkinses, undertook reclamation, but ceased doing so in approximately 2004. In 2006, AFI obtained a judgment against Tom Cabanas, an official of the State of Missouri, for wrongs arising out AFI's business. The net proceeds of the judgment in the approximate amount of $5 million are in the registry of the Court.

On or about January 28, 2009, AFI filed a petition in bankruptcy under Chapter 11, and Christopher J. Redmond was appointed Trustee. The Trustee has undertaken completion of the reclamation of the AFI mine sites. On July 11, 2009, the Jenkinses filed a proof of claim in the principal amount of $4,336,813.10 as a secured claim. The attachments to the proof of claim include the following: (1) An assignment of $3 million of the proceeds of AFI's litigation; (2) three promissory notes in the amounts of $500,000, $500,000, and $1,000,000 (collectively the Notes); (3) and a list of the certificates of deposit pledged to the State of Missouri, having a total face value of $1,377,000 (collectively the Certificates of Deposit).

## II. The Claims Asserted by the Trustee.

The Trustee filed this six-count adversary proceeding on January 27, 2011 (Complaint), against Defendants W. K. Jenkins and M. Earlene Jenkins, along with Cimarron, primarily challenging the Jenkinses' right to payment of their claim. Count I is for recharacterization and disgorgement of the claim based upon the contention that the moneys advanced to AFI and evidenced by the Notes were equity infusions and not true loans. Count II seeks the equitable subordination of any security interest and claim

3

pursuant to § 510(c).[2]  Count III requests a declaratory judgment for unjust enrichment, restitution arising out of the benefit conferred by the Trustee on the Jenkinses, and a surcharge on the interests of the Jenkinses in the Certificates of Deposit with a constructive trust or equitable lien for restitution of the costs expended by the Trustee in completing the reclamation.  Count IV seeks an accounting from the Jenkinses for the profits, revenues, and expenses arising from AFI's mining permits.  Count V seeks an accounting of the Jenkinses' claim.  And Count VI objects to the Jenkinses' claim.

A Final Pretrial Order was filed on May 5, 2012.  It contains extensive stipulations and thorough statements of the issues and theories of the Trustee's claims.  Although a Third Party Complaint was filed, with leave of the Court, by the Jenkinses against Michael Christie and Larry Pommier on August 24, 2011,[3] the docket does not show the issuance of any summonses or service on the third party defendants.  The Final Pretrial Order does not mention the Third Party Complaint.  The Court therefore concludes that the claims attempted to be asserted in that complaint have been abandoned.

### III.  Findings of Fact.

The Court makes the following findings of fact based upon the extensive stipulations in the Final Pretrial Order,[4] the exhibits admitted at trial, and the trial testimony.  The primary fact witnesses concerning the Jenkinses' relationship with AFI

---

[2] 11 U.S.C. § 510(c).  Future references to Title 11 in the text shall be to the section number only.

[3] Dkt. 40.

[4] Dkt. 63.

4

were W.K. Jenkins and Pommier, who because of unavailability, testified by a videotaped examination taken for purposes of the trial. The Court found neither witness to be very credible. Pommier and W.K. Jenkins openly displayed hostility toward one another. W.K. Jenkins' testimony was permeated by a lack of recollection and was often not responsive to the questions posed. Further, the events about which the witnesses testified occurred approximately ten years prior to the trial. The Court therefore relies heavily upon the exhibits.

### A. AFI before its acquisition by the Jenkinses.

The origins of this Chapter 11 case lie in AFI's previous Chapter 11 bankruptcy case in this court, filed on December 9, 1992, Case No. 92-42236 (AFI's First Bankruptcy Case). When that case was filed, AFI was winding up its coal mining operations in Kansas and transitioning to operations known as the "Blue Mound Mine," located in Barton and Vernon Counties, Missouri, under mining permits granted to AFI on leased properties. The permits required that various bonds be submitted as surety for the reclamation of the Blue Mound Mine site properties. In AFI's First Bankruptcy Case, Kevin Checkett was appointed Chapter 11 Trustee with authority to operate the Debtor's business under the terms of a confirmed Chapter 11 plan. Pommier was hired as AFI's field engineer and financial cost analyst. AFI's First Bankruptcy Case was closed on September 14, 1995. Trustee Checkett briefly continued to operate AFI under the terms of the confirmed plan, but in 1996, AFI ceased operations, abandoned the assets of AFI to various creditors, and Checkett resigned as trustee.

5

John Warmack acquired all of the stock of AFI, provided certain new reclamation bonds and replacement reclamation bonds, and took over the operations and control of AFI. Warmack formed Cimarron Energy Company, LLC (Cimarron), which was owned ninety-nine percent by Warmack and one percent by Pommier. Cimarron became the operating company of the mining operations for which AFI held permits on the Blue Mound Mine sites. These sites are referred to as 1990-01 (90-01), 1991-02 (91-02), and 1996-01 (96-01). The equipment of AFI was released to AFI's secured creditors, who ultimately foreclosed and then sold the equipment to Cimarron. AFI remained liable for debts which were not addressed in AFI's First Bankruptcy Case.

### B. The Jenkinses' acquisition and operation of AFI.

On December 6, 1999, the Jenkinses entered into an agreement to purchase AFI from Warmack. The Jenkinses paid Warmack $549,250.00. The Jenkinses purchased all of the stock of AFI and ninety-nine percent of the ownership of Cimarron. However, because W.K. Jenkins was listed in the Federal Office of Surface Mining's Applicant Violator System (AVS), he was prohibited from owning the stock of a surface coal mining company. Therefore, W.K. Jenkins arranged for the ownership of the AFI stock to be placed in the name of Michael Christie, whom the Court has found was a straw man or agent for the Jenkinses, who held the beneficial interest in AFI.[5] Furthermore, through Pommier, W.K. Jenkins directed the operations of AFI and Cimarron; Christie had no

---

[5] Case no. 09-20173, dkt. 455.

significant involvement with either AFI or Cimarron.

The transaction with Warmack also included the purchase of certain equipment owned by Cimarron,[6] and the assignment of twenty-four certificates of deposit (Certificates of Deposit or Certificates) in the total face amount of $1,377,000 that were pledged to secure bonds in favor of the State of Missouri to guarantee reclamation of AFI's permitted mining sites. By agreement, the $549,250.00 purchase funds were used by Warmack to pay down debts of AFI secured by the Cimarron equipment being purchased. The Certificates of Deposit were assigned to the Jenkinses personally, not to AFI or Cimarron, but the Jenkinses' right to the proceeds of the Certificates was contingent upon completion of the reclamation of the permitted tracts for which each of the specific certificates was pledged.[7] The Jenkinses have been receiving interest earned on the Certificates since the purchase of their interest in AFI and Cimarron.

When the Jenkinses acquired their interest in AFI, W.K. Jenkins did not intend to operate the company; the sole purpose for the Jenkinses' investment in AFI and Cimarron was to obtain the proceeds of the equipment of AFI and Cimarron (valued between $1 and $2 million) and the release of the Certificates of Deposit (in the face amount of

---

[6] The record is not clear as to the ownership of the equipment used in the reclamation process. Stipulation paragraph 20, which addresses AFI's circumstances when owned by Warmack, states that the equipment of AFI was released to AFI's creditors, who ultimately foreclosed and sold the equipment to Cimarron. Stipulation paragraph 25 states that the Jenkinses acquired equipment owned by Cimarron, whereas stipulation paragraph 38 states that one of the purposes of the Jenkinses' acquisition of AFI was to obtain the proceeds of the equipment of AFI. Dkt. 63, at 5-7, Stip. ¶¶ 20, 25, & 38.

[7] The record is not complete as to the assignments of all 24 certificates of deposit, but the Trustee does not contest the Jenkinses' position that all 24 certificates were properly assigned to them, subject to the rights of the State of Missouri.

7

$1,377,000) following AFI's reclamation of the permitted sites.[8]

AFI did not recognize or follow corporate formalities or hold annual shareholder and board of directors meetings.  W.K. Jenkins delegated the day-to-day operation of AFI and Cimarron to Pommier.  The activities of AFI were conducted through Cimarron; Cimarron held all of the assets, primarily the operating and reclamation equipment.  Arranging the business in this manner, with AFI having no assets, served to protect the operations from the claims of AFI's creditors.  AFI had no income other than money provided by the Jenkinses.  Funds were provided through checks payable to AFI drawn on accounts of Green Acres Farms, a fictitious name for the Jenkinses that was registered with the Missouri Secretary of State.  The checks were delivered to Pommier, who then endorsed them for payment to Cimarron.

At the time the Jenkinses purchased AFI from Warmack, the coal mining operations had stopped and all that was left to do was the reclamation process.  From 1999 to approximately 2004, when Cimarron's equipment was sold, AFI, Cimarron, and the Jenkinses sought to complete the reclamations to allow the Jenkinses "to take possession of the Bonds/Certificates of Deposit."[9]  According to Pommier, Cimarron had two categories of equipment:  (1) that originally owned by AFI, which was transferred to Cimarron before the Jenkinses purchased AFI, the liens on which were paid off by

_____

[8] Dkt. 63 at 6-7, stip. ¶ 38.  However, W.K. Jenkins testified that he originally intended to purchase the interests from Warmack for immediate resale to another party, but even though that transaction fell through, he decided to proceed with the purchase.  (Tr. Vol. II., at 81-82).

[9] Dkt. 63 at 6, stip. ¶ 28.

Warmack from the purchase price paid by the Jenkinses; and (2) equipment purchased by Cimarron at auction, funded by Girard Bank, which liens were paid off using funds from an arbitration award in favor of Cimarron. Pommier also testified that W.K. Jenkins sold both categories of equipment and retained the proceeds, without crediting them to the amounts allegedly owed to him by AFI.[10] The record is insufficient for the Court to determine the value of the equipment, but there is evidence that it could have been worth between $1 and $2 million.

### C. The Cabanas Lawsuit.

In 2002, when Pommier and W.K. Jenkins believed that the reclamation was nearly complete and that the State of Missouri had unreasonably blocked and interfered with the reclamation so that the reclamation would never be found fully satisfactory, a lawsuit was filed by AFI and Pommier against Tom Cabanas and Richard Hall, officers and employees of the Missouri Department of Natural Resources, in the United States District Court for the Western District of Missouri, Case no. 4:02-cv-01182-JTM (Cabanas Lawsuit). It alleged claims for tortious interference with plaintiff's business with Midwest Coal, violation of 28 U.S.C. § 1983 for discriminatory application of laws and regulations of the State of Missouri, and retaliation for the exercise of rights protected

---

[10] Pommier further testified that the amount sought by the Jenkinses' proof of claim includes the $170,000 paid to Girard National Bank to release the lien on the second group of equipment. The exhibits support this assertion. (Pommier Tr., at 110-16; Def. Exhs. 26 & 28). Pommier also testified that the source of the $170,000 was an arbitration award against Mackie Clemmons Coal Company in favor of Cimarron, which means the Jenkinses are in effect seeking to recover from AFI funds received by the Jenkinses from an arbitration award which were used for their own benefit.

9

by the First Amendment of the United States Constitution.  Summary judgment was granted to the defendants on the last two claims, but the tortious interference claim was tried to a jury.  Judgment was entered on September 6, 2006, in favor of AFI against Tom Cabanas for actual damages of approximately $5.5 million and punitive damages in the amount of $900,000.  The verdict was appealed, and the judgment amount was reduced.  On or about September 16, 2008, the State of Missouri satisfied the judgment by paying into the registry of the federal District Court for the Western District of Missouri a little over $7 million.

### D.  AFI's filing for relief under Chapter 11 in 2009.

The judgment prompted many persons to make claims against AFI.  On January 28, 2009, AFI filed this bankruptcy for assistance in determining the priority of the payment of creditors.  On June 30, 2009, the Chapter 11 Trustee caused $4,956,377.68 held in the registry of the federal District Court for the Western District of Missouri, the judgment proceeds remaining after payment of contingent attorney fees and costs, to be transferred to him on behalf of AFI's bankruptcy estate.  These funds are the primary assets of the estate.

### E.  The claims filed against AFI by creditors other than the Jenkinses.

The claims register shows total proofs of claim in the amount of $11,247,349.18 have been filed in this case.  The register shows this includes $5,735,536.08 in unsecured claims.  It shows a single secured claim of $4,336,813.10, which is the amount of the secured claim of the Jenkinses that is the subject of this adversary proceeding.  The

10

register also shows $1,175,000.00 of claims as "Unknown." Three of the largest

unsecured claims arose before or during AFI's First Bankruptcy Case, which was filed on

December 9, 1992, and closed on September 14, 1995. A group of companies

collectively referred to as Beachner filed a proof of claim for payment of $1,711,222.00

arising out of an agreement dated February 18, 1993, between Beachner and AFI as the

debtor in possession in AFI's First Bankruptcy Case. Travelers Casualty & Surety

Company filed a proof of claim for $1,203,110.04 arising out of an agreement to issue

surety bonds dated February 22, 1991, related to permitted tract 90-01. Two companies

referred to as Continental filed separate proofs of claim asserting a claim of

$1,048,421.00, arising out of an indemnity agreement dated February 19, 1993, among

Continental, Beachner, and AFI as the debtor in possession in AFI's First Bankruptcy

Case. The Missouri Department of Natural Resources filed four proofs of claim for a

total of $1,700,836.58 related to permits 90-01 and 91-02, seeking various fines and

penalties related to AFI's failure to properly complete the reclamation of the permitted

sites. The Trustee asserts that the Department's claims are related in part to AFI's First

Bankruptcy Case.

Additional unsecured claims not arising out of AFI's First Bankruptcy Case were

filed by DeZube Miller PA for $21,125.46 and by The Fowler Land Company, owners of

property subject to AFI's mining permits and on which reclamation has not been

completed, for $177,400.00. Warmack filed a proof of claim asserting a secured claim of

11

$47,357.02,[11] an unsecured claim of $244,692.00, and an additional unsecured claim for damages in an unknown amount. The Caskey Hopkins Law Firm filed a claim for $162,790.00.

### F. The Jenkinses' proof of claim.

The Jenkinses filed a secured claim for $4,336,813.10. The Jenkinses state their claim arises from: (1) $3,823,862.92 for payment of the Notes in the amounts of $500,000, $500,000, and $1 million, plus interest thereon, secured by the assignment of the judgment in the Cabanas Lawsuit; and (2) $487,298.62 for "money" related to reclamation, and (3) accounts for Dan Card in the amount of $7,676.00 and Pat Miller in the amount of $17,975.56. Although the attachments to the proof of claim include a list of the assigned Certificates of Deposit in the total principal amount of $1,377,000, which are pledged to the State of Missouri, and the narrative references these Certificates, the total of the claim is the sum of items one, two, and three above, without inclusion of the Certificates. This is correct, since the Certificates were assigned to the Jenkinses individually and not to AFI.

The Notes which are attached to the Jenkinses' proof of claim were executed by AFI upon the signature of Pommier, President/Secretary, are payable to Green Acres Farms or assigns, and bear the signature of W.K. Jenkins as a witness. They are as follows: Note dated December 6, 1999, in the principal sum of $500,000; Note dated

---

[11]For some unknown reason, this amount was not added to the amount of the Jenkinses' secured claim to arrive at the secured claims total shown on the claims register.

November 6, 2000, in the principal sum of $500,000; and Note dated October 11, 2001, in the principal sum of $1,000,000. The interest rates are 9.5%, 9.0%, and 8.0%, respectively. The payment terms of the three Notes are identical, and are discussed below. Generally, they state the Notes are due in five years.

When the Notes were executed, AFI was engaged in reclamation, not mining, and had no expected source of income for payment of the Notes. Pommier testified that he and W.K. Jenkins made inquiries for loans to at least six banks, but none agreed to loan to AFI. Since the Certificates of Deposit had been assigned to the Jenkinses personally and were not property of AFI or Cimarron, they were not a potential source of payment of AFI's liability on the Notes. The equipment was owned by Cimarron. No payments on the Notes were ever made to the Jenkinses. Although Cimarron's equipment was sold in approximately 2004 and W.K. Jenkins probably retained the proceeds for his own benefit, no credit was applied to the Notes.

The Jenkinses assert that the consideration for the Notes was money loaned to AFI, primarily for the reclamation efforts. The parties stipulated that the Jenkinses made advances to AFI for the specific purpose of obtaining the release of the Certificates of Deposit.[12] There was no written agreement between AFI and Cimarron relative to reclamation and expenses.[13] The Jenkinses' alleged payment of AFI's costs of reclamation was memorialized in worksheets prepared annually enumerating the

---

[12] Dkt. 63 at 7, stip. ¶ 43.

[13] Dkt. 63 at 7, stip. ¶ 41.

numerous checks payable to AFI and drawn on the account of Green Acres Farms. There is no direct correlation between these worksheets and the amount of the Notes. The first Note for $500,000 is dated December 6, 1999, the same date that the Jenkinses paid Warmack for the purchase of AFI and related assets. But there is no accounting of a transfer made to AFI at that time and no other evidence that a transfer was made. For year 2000, one accounting shows transfers of $710,906.16 and another accounting shows transfers of $729,774.98. The Note dated November 6, 2000, is for $500,000. For year 2001, an accounting shows transfers of $332,610.27. The Note dated November 6, 2001, is for $1 million. Pommier testified that the $1 million Note was a replacement for the two prior $500,000 Notes, but W.K. Jenkins denied this assertion.

The payment terms of the Notes are identical.[14] They provide:

> Principal balance plus accrued interest shall be due and payable five (5) years from the date shown above. This note shall be paid in full upon reclamation bond release from the State of Missouri. Said bonds currently being used to secure reclamation liability for Alternate Fuels, Inc at Blue Mound Mine.

Pommier testified that 5 years was selected for maturity because it was the minimum period for release of the bonds securing the reclamation. Pommier also testified that if the Jenkinses got the bond money upon release by the State, then AFI would not owe any money on the Notes. W.K. Jenkins testified that the bond release was the only way he was going to get paid.

---

[14] The payment terms of the first two Notes were exactly as reproduced here, and the payment terms of the third Note had two non-substantive deviations.

At trial, a fourth note, dated March 1, 2003, in the principal amount of $2,370,761.00, was admitted into evidence. No copy of this note is attached to the proof of claim. It states it is a renewal of the Notes, the first $500,000 Note, the second $500,000 Note, and the $1 million Note. The principal of the renewal note includes accrued interest on the Notes, and the renewal note references proceeds of the Cabanas Lawsuit. The payment terms of the renewal note read:

> Principal balance plus accrued interest shall be due and
> payable on or before five (5) years from the date shown above
> at Route 2 Box 97 Adrian, Missouri 64720. This note shall be
> paid in full upon reclamation bond release from the State of
> Missouri or proceeds from lawsuit filed in Federal Court case
> no 02CV1182 said bonds currently being used to secure
> reclamation liability for Alternate Fuels, Inc. at the Blue
> Mound Mine.

By "Assignment of Chosen [sic] in Action" signed on March 1, 2003, the same date as the renewal note, AFI assigned to the Jenkinses the following:

> Three Million Dollars ($3,000,000.00) of their claims,
> demands and cause of action or causes of actions [sic] of any
> kind whatsoever which the undersigned has or may have
> against Richard Hall, Tom Cabanas and the State of Missouri
> arising from the following:
>> 1) Operation of the Blue Mound Mine
>> 2) Order to show cause
>> 3) Action of the defendants and the Land Reclamation
>> Commission of the State of Missouri.

On or about February 15, 2007, after the jury verdict was affirmed in part and a judgment was entered, a Notice of Assignment of Judgment in favor of the Jenkinses was filed in the Cabanas Lawsuit. W.K. Jenkins testified that the assignment exceeded the

15

amount of the March 2003 note because he knew he would have "to put up some more money."[15] There are no notes evidencing loans for money advanced after 2003. The Defendants stipulated that "W.K. Jenkins directed Pommier to execute the Assignment to help secure Jenkins' investment in AFI and Cimarron in the completion of the reclamation and the ultimate release of the Bonds/Certificates of Deposits to Jenkins."[16]

The Defendants did not provide attachments to the proof of claim or trial evidence to support or explain the second and third elements of the proof of claim, the $487,298.62 for "money" related to reclamation and the $25,651.56 in accounts for Dan Card and Pat Miller. A hand-written attachment to the proof of claim, labeled Exhibit G, brackets both the amount of the Notes, with interest, and the sum of $487,298.62 as "reclamation." There was no testimony about the $487,298.62 portion of the claim. Prepared exhibits which appear to substantiate this amount were not admitted into evidence.[17] There was no testimony referring to Dan Card. There was no testimony that Pat Miller was owed $17,975.56, although W.K. Jenkins did make reference to a Miller deal.[18] The parties stipulated that the "real purpose of the Assignment, the 1999 Note, 2000 Note, 2001 Note,

---

[15] Tr. Vol. II at 101. The exhibit notebook provided to the Court before trial contains a document identified as Defendants' Exhibit 31 entitled "money lent after 3-1-2003" showing the following amounts: legal $98,676.32, machine hire $14,043.12, and Girard Bank $99,492.52, but it was not admitted into evidence.

[16] Dkt. 63 at 6, stip. ¶ 36.

[17] Five exhibits submitted by the Defendants before trial but not admitted into evidence purport to show 2002 money, 2003 money, 2004 money, 2005 money, and 2006 money, in the total sum, with interest, of $487,298.62. (Def. Exh. 34 - 38).

[18] Tr. Vol. III, at 80-82.

16

and the amounts listed in Exhibit G to Jenkins Claim was to secure Jenkins investments in AFI and Cimarron."[19]

## G.  Reclamation of the permitted areas.

AFI held three permits which are involved in this litigation.  Permitted site 90-01 is about 303 acres; permitted site 91-02 is about 445 acres; and permitted site 96-01 is 198 acres, for a total of around 950 acres.  AFI's mining operations ceased in 1999, and thereafter its obligation was to reclaim the three sites.

The State of Missouri is involved in each aspect of the mining and reclamation process.  The Jenkinses had political connections through Harold Caskey, a former State Senator who was also the Jenkinses' attorney.  Caskey set up a meeting for W.K. Jenkins and Pommier to confer with then-Governor Mel Carnahan in Jefferson City.  After the meeting with Governor Carnahan, the Jenkinses decided to move forward and acquire John Warmack's interest in both AFI and Cimarron.  At the time the Jenkinses and Pommier were undertaking the reclamation of the permitted sites, the Jenkinses' son, Hugh Jenkins, was a member of the Land Reclamation Commission for the State of Missouri.

The reclamation process begins when an applicant seeks a permit to engage in coal mining operations.  The permit process must include, among other things, a proposed analysis of the land's current use and an initial reclamation plan, which typically includes

---

[19] Dkt. 63 at 6, stip. ¶ 35.

three phases. Phase I includes re-contouring, shaping, and stabilizing, Phase II includes

getting a quality stand of grass that is appropriate to control erosion and, in some cases,

showing initial productivity or composition of species of grass. In the final phase, the

operator must demonstrate the ability to sustain the vegetation, which is accomplished by

productivity measurements of grass yields or, in the case of prime farm land, comparisons

of the yields of deep-rooted crops such as corn or soybeans before and after the mining.

Generally, during the initial stages of the coal-mining permitting process, the State

determines a per-acre cost it believes will be incurred in the reclamation process as to

each phase of reclamation. Bonds are required to secure the estimated costs, and portions

of the bonds are typically released as each stage of the reclamation is successfully

completed. As to site 90-01, Travelers put up a bond in the amount of $800,000 for Phase

I, and the State has granted the release of that bond. There is a remaining bond of

$88,750 to insure the completion of Phases II and III on permitted site 90-01. Continental

Insurance Company put up four surety bonds totaling $812,000 on permitted site 91-02.

A total of $144,000 has been released, leaving approximately $668,000 remaining on the

Continental bonds. When work was going to be done at site 96-01, no bonding company

would provide a bond, so the Certificates of Deposit in the amount of $1,377,000, which

have been assigned to the Jenkinses, were pledged as security for the completion of the

reclamation on site 96-01. The State of Missouri required that the Certificates of Deposit

also serve as additional security for the reclamation on sites 90-01 and 91-02.

In 2002, in the opinion of Pommier and W.K. Jenkins, the reclamation was 95% to

18

98% completed. In an attempt to obtain the release of the Certificates of Deposit, W.K. Jenkins and Pommier submitted a report to the State prepared by R. Scott Brundage taking the position that the reclamation was substantially completed. The State did not agree with the assessment. As stated above, Pommier and W.K. Jenkins believed that the State had unreasonably blocked and interfered with the reclamation efforts and that they would never be able to satisfy the State. This led to the abandonment of reclamation efforts and the filing of the Cabanas Lawsuit.

After AFI filed for relief under Chapter 11 on January 28, 2009, Plaintiff Christopher Redmond was appointed as Trustee. The Trustee retained Dennis Meier with Triad Environmental Services to assist in advising and executing the reclamation process for the permitted sites. According to Meier, the 2002 Brundage Report greatly underestimated the cost of the remaining reclamation. For example, it failed to fully consider the acidic/toxic issues, did not review the subsoil composition or topsoil depth, and did not give any consideration to the removal of water impoundments. While a large amount of the reclamation had been done by Jenkins and Pommier before Triad became involved, a substantial amount of reclamation remains to be done before the completion and the release of the bonds and Certificates of Deposit. The Court finds the testimony of Meier credible and rejects the Defendants' arguments that the Trustee is undertaking unnecessary reclamation.

At the time the Trustee was appointed, site 90-01 was in the best reclamation shape among the three permitted sites. Phase I reclamation of site 90-01 has been

19

completed. The work included placing soil in three locations and repairing eroded structures, such as dams. The Trustee has requested the State to release a portion of the bonds as to the Phase I reclamation of 90-01. The cost to complete Phase I of the reclamation of permitted site 90–01 was approximately $198,000. The Trustee is moving forward on Phases II and III.

The Trustee and Triad have not devoted a substantial amount of attention to the reclamation of site 91-02 due to the fact that there is pending litigation with some landowners over the level of reclamation required. The landowners seek to have a water impoundment of approximately fourteen acres removed and totally re-fielded with soil. The Trustee's approach, which has been preliminarily approved by the State, is to leave the fourteen-acre water impoundment on 91-02 in place. Therefore it is not possible at this time to estimate the cost of reclamation of 91-02.

As to site 96-01, the Trustee has submitted a plan to the State which has been approved. It estimates the preliminary costs for Phase I to be $715,000. The site contains 21.7 acres of prime farm land that has been disturbed and must be restored. That area will require the addition of 48 inches of total soil material to be comprised of primary subsoils, clays, and then a topsoil layer. An additional area of 4.2 acres must also be restored to prime farm land. The plan will require 46,000 yards of subsoil and about 12,000 yards of topsoil. In addition, some areas will require as much as 50 tons of lime per acre in order to adjust for the acidic/toxic-type soil. The plan was submitted to sixteen different local contractors to return bids. The reclamation work for this site has

20

been bifurcated. The best bid for the Phase I reclamation was approximately $392,000, whereas the long-term maintenance was broken out and given to another contractor. Work on Phase I will start in the fall of 2012 and should be completed in late winter or early spring. Once completed, the Trustee may apply for Phase I release of the bonds for this site. Mr. Meier testified that it could take as much as six years to fully complete the reclamation of site 96-01.

The reclamation cost incurred and paid by the estate as of April 25, 2012, was $519,454.78. The source of the funds to pay these costs has been the proceeds of the Cabanas Lawsuit. But for the existence and availability of the judgment proceeds, the Jenkinses would have been required to fund the reclamation necessary for the release of the bonds/certificates of deposit, or else the bonds/certificates of deposit would have been forfeited and the proceeds used to fund the reclamation.[20] The Trustee cannot currently estimate the funds necessary to complete the reclamation due to the problems associated with permitted site 91-02 litigation.

**ANALYSIS.**

**I.      Count I - Recharacterization of alleged loans as equity infusions.**

**A.  Applicable Standard.**

In Count I of the Complaint, the Trustee prays that the Court recharacterize as equity investments the three "loans" allegedly made by the Jenkinses to AFI and

---

[20] Dkt. 63 at 7, stip. ¶ 47.

evidenced by the Notes dated November 6, 1999, November 6, 2000, and October 11, 2001. "When a bankruptcy court 'recharacterizes' debt, it treats as equity or investment what the parties characterized as debt."[21] "[T]he courts effectively ignore the label attached to the transaction at issue and instead recognize its true substance. [If recharacterized, t]he funds advanced are no longer considered a loan which must be repaid in bankruptcy proceedings as . . . debt, but are instead treated as a capital contribution."[22]

A bankruptcy court's authority to recharacterize debt is found in § 105.[23] Recharacterization is distinct from equitable subordination. Equitable subordination is governed by § 510(c) of the Code. "The doctrine of equitable subordination looks not to the substance of the transaction but to the behavior of the parties involved."[24] The claims in issue are still considered outstanding debt, but inequity and unfairness perpetrated against the debtor's other creditors is remedied by postponing the subordinated creditor's payment until after others' claims have been satisfied.[25] Subordination, discussed further below, is a remedy for inequitable conduct; recharacterization addresses the substance of

---

[21] Jonathan Friedland & Michelle Fisk, *Characterizing the Current State of Recharacterization*: Radnor *is Not All You Need to Know*, 2007 No. 6 Norton Bankr. L. Adviser 2 (2007).

[22] *In Re Hedged-Investments Assocs.*, 380 F.3d 1292, 1297 (10th Cir. 2004).

[23] *Characterizing the Current State of Recharacterization*, 2007 No. 6 Norton Bankr. L. Advisor 2.

[24] *Hedged-Investments*, 380 F.3d at 1297.

[25] *Id*.

22

the transaction.

The Tenth Circuit Court of Appeals recognizes a bankruptcy court's authority to recharacterize alleged debt as equity.[26]  In reliance on case law making the same distinction between debt and equity for purposes of the Tax Code, it has adopted the following as a nonexclusive list of factors:

to distinguish true debt from camouflaged equity:

> (1) the names given to the certificates evidencing the indebtedness;
> (2) the presence or absence of a fixed maturity date;
> (3) the source of payments;
> (4) the right to enforce payment of principal and interest;
> (5) participation in management flowing as a result;
> (6) the status of the contribution in relation to regular corporate creditors;
> (7) the intent of the parties;
> (8) "thin" or adequate capitalization;
> (9) identity of interest between the creditor and stockholder;
> (10) source of interest payments;
> (11) the ability of the corporation to obtain loans from outside lending institutions;
> (12) the extent to which the advance was used to acquire capital assets; and
> (13) the failure of the debtor to repay on the due date or to seek a postponement.[27]

"None of these factors is dispositive and their significance may vary depending upon

---

[26] *Sinclair v. Barr (In Mid-Town Produce Terminal, Inc.)*, 599 F.2d 389, 393-394 (10th Cir. 1979); *Hedged-Investments*, 380 F.3d at 1297-99.

[27] *Hedged Investments*, 380 F.3d at 1298 (citing *Stinnett's Pontiac Serv. Inc. v. Comm'r of Internal Revenue*, 730 F.2d 634, 638 (11th Cir. 1984)).

circumstances."[28]  Since the question is whether the "objective facts establish an intention to create an unconditional obligation to repay the advances,"[29] the factors are applied at the inception of the transaction.  In this case, therefore, AFI's obtaining a judgment against Cabanas in 2006, years after the Notes were executed, is not relevant.

**B.**     **The alleged transfers evidenced by the three Notes should be recharacterized as equity investments.**

The foregoing factors contemplate transactions with a corporation with an ongoing business, making their application in this case less than straightforward.  As applied to this case, three of the factors, numbers one, five, and twelve, superficially support treating the AFI Notes payable to the Jenkinses as loans.  But a closer analysis shows this superficial support is misleading.

As to the first factor, the documents on which the Jenkinses base their claim for $2 million plus interest state they are promissory notes.  They utilize a preprinted form but the provisions regarding acceleration upon failure to make timely payment, recovery of attorney fees if the note is placed for collections, and late fees are stated to be "N/A."

As to the fifth factor, there is no evidence that W.K. Jenkins increased his participation in the management of AFI as a result of the advancements.  But this is because the first loan was made the day AFI was acquired, and throughout the period when AFI was undertaking reclamation, W.K. Jenkins, through Pommier, exercised

---

[28] *Id*. at 1298-99.

[29] *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986).

24

complete control of AFI.

As to the twelfth factor, the use of funds to meet operating expenses is generally indicative of a loan.[30] In this case, the advances were for AFI's operations, conducted through Cimarron, rather than for the acquisition of capital assets. However, since AFI had no expenses other than the funding of operations conducted by Cimarron, this factor is of reduced significance. AFI devoted no funds to the acquisition of capital assets, so there was no decision to make whether to fund operations or to purchase assets with the advances from the Jenkinses.

Two factors are not relevant to this case. The sixth factor, the status of the contribution in relation to regular corporate debtors, addresses whether the advances were subordinated to claims of other creditors.[31] Subordination to claims of other creditors indicate that the advances were capital contributions, not loans.[32] Since AFI had no income other than the Jenkinses' advances to pay creditors, the fact that creditors were paid and the Jenkinses were not has no relevancy. The tenth factor is the source of interest payments. Since there were no interest payments made, this factor is not relevant.

The remaining factors strongly indicate that the advances were in fact infusions of equity. As to the second factor, each Note states the "Principal balance plus accrued

---

[30] *Roth Steel Tube Co.*, 800 F.2d at 632.

[31] *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 752 (6th Cir. 2001).

[32] *Id.*

25

interest shall be due and payable five (5) years from the date shown above."  But each

also states that the Note "shall be paid in full upon reclamation bond release from the

State of Missouri."  The evidence is that since AFI had no source of revenue when the

Notes were executed, the expectation was that the Notes would not be paid until the

Certificates of Deposit were released at an uncertain time in the future.  The Court

therefore finds that the Notes in fact did not have a fixed maturity date.  This is a factor

indicative of an equity advance.

The third factor examines the source of payment.  "If the expectation of repayment

depends solely on the success of the borrower's business, the transaction has the

appearance of a capital contribution."[33]  AFI had no business other than the completion of

reclamation.  Even that completion would not generate revenue for AFI, but it would

result in the release of the Certificates of Deposit which were assigned to the Jenkinses

and were looked to by the parties as the source of payment of the Notes.  The third factor

strongly indicates a capital infusion.

As to the fourth factor, "[i]f a fixed obligation to repay the advances exists, the

transaction appears to be a loan."[34]  Although examination of the Notes would appear to

have given the Jenkinses the right to enforce payment after five years, that apparent right

was illusory.  The Jenkinses understood that AFI had no ability to pay and any attempt to

---

[33] *Roth Steel Tube Co.*, 800 F.2d at 631.

[34] *Stinnett's Pontiac Service, Inc. v. Comm'r of Internal Revenue Serv.*, 730 F. 2d 634, 639 (11th Cir. 1984).

enforce payment would be futile. No attempts were made to enforce the Notes.

The seventh factor considers the intent of the parties. Although the testimony of W.K. Jenkins and Pommier varies as to details, both witnesses confirmed that the Notes did not evidence loans in the traditional sense. There were no advancements of the principal amounts of the Notes in a lump sum, or even in several advances related to the Notes. Rather, the evidence is that the amounts of the Notes were not directly related to transfers to AFI, but did roughly reflect the sum of checks that had been written by Green Acres to AFI during the prior year. W.K. Jenkins never intended the loans to be paid by AFI. The Jenkinses stipulated that the "real purpose of the [three Notes] . . . was to secure Jenkins investments in AFI and Cimarron."[35]

The thin capitalization of AFI is a factor strongly supporting recharacterization. "Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans."[36] In this case, when the Jenkinses purchased AFI from Warmack, it had no assets other than the mining permits, which were in fact liabilities since they were the source of AFI's reclamation obligations. The equipment used by AFI was owned by Cimarron. But despite its first bankruptcy, filed in 1992 and closed in 1995, AFI had over $2 million in debt when the Jenkinses bought it in 1999.

The ninth factor, identity of interest between the creditor and the stockholder, applies the premise that if advances are made by stockholders in proportion to their

---

[35] Dkt. 63 at 6, stip. ¶ 35.

[36] *Autostyle Plastics*, 269 F.3d at 751.

27

respective stock ownership, an equity contribution is indicated.[37]  In this case, the

Jenkinses are 100 per cent owners of AFI and made 100 percent of the advances.  An

equity contribution is indicated.

The eleventh factor, the inability of AFI to obtain loans from outside lending

institutions, also strongly supports recharacterization.  The evidence is that AFI

approached at least six banks but was unable to obtain financing.  "When there is no

evidence of other outside financing, the fact that no reasonable creditor would have acted

in the same manner is strong evidence that the advances were capital contributions rather

than loans."[38]

The thirteenth factor considers the failure of the debtor to repay on the due date or

to seek a postponement.  AFI did not pay the Notes by the five-year due dates and did not

seek an extension of the dates.  There is no evidence that this was considered a default,

since the Jenkinses were looking to the Certificates of Deposit, rather than AFI, for

payment of the Notes.  These facts strongly support an equity investment rather than a

true loan.

Application of the factors identified by the Tenth Circuit requires the Court to

conclude that the advances represented by the three Notes were equity infusions and not

true loans.  None of the three factors which would customarily indicate a loan — the title

of the documents, the absence of an increase in participation in management as a result of

---

[37] *Roth Steel*, 800 F.2d at 630.

[38] *Autostyle Plastics*, 269 F. 3d at 752.

28

the advances, and the use of the advances for operating expenses — do so in this case. Two factors are irrelevant. The remaining factors strongly support recharacterization. There was no fixed maturity date, AFI had no present or expected source of funds to repay the advances, the parties did not intend a true loan, AFI was thinly capitalized, AFI had no ability to obtains loans from lending institutions, and AFI failed to pay the Notes or seek an extension after the passage of the five-year due dates stated in the Notes.

C.   The alleged transfer of $487,298.62 should be recharacterized as an equity investment.

The Jenkinses' proof of claim, in addition to seeking payment of the three Notes, also seeks payment of $487,298.62 for money related to reclamation and to accounts for Dan Card and Pat Miller. There is no evidence from which the Court can conclude that this amount is other than an additional equity investment. There is no promissory note from AFI as to this portion of the claim. The Jenkinses presented no evidence to substantiate the claim other than exhibit G to the proof of claim, which identifies most of the funds as "reclamation." The parties stipulated that the real purpose of the amount listed on Exhibit G "was to secure Jenkins investments in AFI and Cimarron." For these reasons, as well as the reasons examined above with respect to the claim based upon the Notes, the Court holds that the claim for $487,298.62 must recharacterized as equity, not a loan to AFI.

D.   Because the Jenkinses do not have an allowed claim, the estate's interest in the judgment entered in the Cabanas Lawsuit is not subject to a $3 million lien in their favor.

29

The Jenkinses argue that their claim for the funds advanced to AFI is secured by the assignment of $3 million of the judgment in the Cabanas Lawsuit.  Under the Bankruptcy Code, only allowed claims may be secured claims.  Section 506(a)(1)[39] defines a secured claim as follows:  "An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property."

Under § 502, the Jenkinses are not the holders of an allowed claim.  The Jenkinses filed a proof of claim; the Trustee objected; and the Court has disallowed the claim, since the transfers which are the basis of the claim must be recharacterized as equity infusions rather than loans.  The Jenkinses therefore are not the holders of a claim secured by the $3 million alleged assignment of the Cabanas Judgment.  The Court holds that the estate's interest in the proceeds of the Cabanas Lawsuit is not encumbered by a lien that secures any of the amount claimed by the Jenkinses.

## II.      Count II - Equitable Subordination.

The Jenkinses claim to be the holders of a claim for $4,336,813.10 secured by an assignment of $3 million of the judgment in the Cabanas Lawsuit.  As an alternative to his recharacterization argument, the Trustee alleges that the Jenkinses' claim, if allowed as a secured claim, should be subordinated to the bankruptcy estate's administrative expenses and the claims of all other creditors.  Equitable subordination is addressed by § 510(c),

---

[39] 11 U.S.C. § 506(a)(1).

which provides:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may —
> (1)     under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest, or
> (2)     order that any lien securing such a subordinated claim be transferred to the estate.

Because of the lack of statutory specifics, the details of equitable subordination have been developed by case law.  Generally, three conditions must be present:  "'(1) 'inequitable conduct' on the part of the claimant sought to be subordinated; (2) injury to the other creditors of the bankrupt or unfair advantage for the claimant resulting from the claimant's conduct; and (3) consistency with the provisions of the Bankruptcy Code."[40] "'Inequitable conduct' for subordination purposes encompasses three categories of misconduct:  'fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego.'"[41]  When examining a transaction for evidence of inequitable conduct, the Tenth Circuit applies different levels of scrutiny to insiders and non-insiders.  "Where the claimant is an insider or a fiduciary, the party seeking subordination need only show some unfair conduct, and a

---

[40] *Hedged-Investments*, 380 F.3d at 1300 (*citing Benjamin v. Diamond (In re Mobile Steel)*, 563 F.2d 692, 699-700 (5th Cir. 1977)).

[41] *Id*. at 1301 (*quoting Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators)*, 926 F.2d 1458, 1467 (5th Cir. 1991)).

31

degree of culpability, on the part of the insider."[42]

The Court finds that for purposes of equitable subordination, W.K. Jenkins engaged in inequitable conduct when obtaining the Notes from AFI and taking the assignment of the judgment as security for his transfers to AFI. The Jenkinses, as the equitable owners of 100 per cent of AFI and 99 per cent of Cimarron, were insiders of AFI.[43] They were in control of AFI, which control they exercised through Cimarron and Pommier. Because of this status, they owed fiduciary duties to AFI.[44] Yet, W.K. Jenkins has in effect admitted to having breached his fiduciary duties by repeatedly and convincingly stating that his purpose when operating AFI was to secure the release of the Certificates of Deposit for his personal benefit. It is uncontroverted that AFI was undercapitalized. When Jenkins advanced the funds in 1999, 2000, and 2001, which he claims gave rise to his secured claim, AFI had no assets to fund its reclamation obligations. Two of the three categories of misconduct identified by the Tenth Circuit are present.

Moreover, specific acts of W.K. Jenkins were inequitable. First, although the Jenkinses provided the consideration for the purchase of AFI and related assets, Jenkins arranged for ownership of their interest in AFI to be held by a straw man, Christie. This was necessary because W.K. Jenkins was legally blocked from owning the stock of a

---

[42] *Id.*

[43] *See* 11 U.S.C. § 101(31).

[44] *See Becker v. Knoll*, 291 Kan. 204, 209, 239 P.3d 830,834 (2010).

32

surface coal mining company by the Federal Office of Surface Mining's Applicant Violator System. Despite the record ownership in Christie, W.K. Jenkins had complete control of AFI, which he exercised through Cimarron and Pommier.

The Jenkinses' "loans" to AFI were in fact substitutions for equity or risk capital. The first Note was executed the day that the Jenkinses closed the transaction to purchase AFI, when AFI had no assets and no way to repay the "loan." The subsequent two Notes were executed *after* funds had been advanced via multiple checks drawn over approximately one-year periods for AFI's operations, conducted by Cimarron. W.K. Jenkins expected to be compensated through release of the Certificates of Deposit rather than through payment by AFI. The Notes evidence a method of accounting for transferred funds more than an obligation to pay.

W.K. Jenkins has not accounted for sales of assets of AFI or its operating company, Cimarron. Two groups of equipment which were used in the reclamation process were sold, and there has been no explanation of the disposition of the proceeds. Pommier testified that W.K. Jenkins retained the proceeds, and there has been no convincing evidence to refute this conclusion.

W.K. Jenkins exercised his control over AFI to cause AFI to assign $3 million of the approximately $5 million net recovery from the Cabanas Lawsuit to secure his transfers to AFI. The assignment is approximately 60 per cent of the judgment. AFI did not file the Cabanas Lawsuit until late 2002, and the assignment was not executed until after the three Notes were executed by AFI. Those proceeds are the only asset of AFI that

33

is available for the payment of approximately $5.7 million in unsecured claims held by outside creditors of AFI, primarily bonding companies who posted bonds related to the reclamation during AFI's First Bankruptcy Case, and for payment of the administrative costs of this proceeding, including the costs of reclamation which are being undertaken by the Trustee to fulfill AFI's reclamation obligation. W.K. Jenkins admits that he caused AFI to assign the $3 million interest to him to be sure he was repaid the funds he had invested in AFI.

Even if the Court were to assume that the Jenkinses hold an allowed secured claim, absent subordination, allowance of that claim would cause injury to other creditors of AFI. The judgment in the Cabanas Lawsuit is the only source of funds for the payment of administrative expenses and unsecured claims, most of which predated the Jenkinses' acquisition of AFI.

The question is the extent of the subordination. The Trustee requests that the Jenkinses' claim be treated as an unsecured claim subordinate to all administrative expenses and all other unsecured claims. The Court finds that this would be too harsh a remedy. The transfers to AFI were beneficial to AFI and its bonding company creditors. Absent the transfers, no reclamation could have been undertaken. However, the assignment of $3 million of the proceeds of the Cabanas Lawsuit to secure the Jenkinses' transfers has no such salutary purpose. If enforced, it would clearly grant the Jenkinses, insiders of the Debtors who have acted inequitably, an unfair preference over other creditors, including administrative expense claimants. The Court concludes that

34

subordination of the Jenkinses' claim to the level of an unsecured claim on par with the other unsecured claims, accompanied by the transfer of the Jenkinses' interest in the Cabanas judgment to the estate, would be equitable in this case.[45]

**III.   The Trustee is not entitled to a declaratory judgment surcharging the Jenkinses' interests in the Certificates of Deposit for the Trustee's costs of reclamation under the theories of unjust enrichment, restitution, constructive trust, or equitable lien.**

The Trustee asserts that the Jenkinses have been unjustly enriched by the bankruptcy estate's reclamation of the permitted sites.  And as a result, the Trustee argues, he "is entitled to have the Jenkinses['] interests in the Certificates of Deposit subjected to and charged for the costs incurred by the bankruptcy estate for the reclamation of the permitted sites and the administration of this estate."[46]  According to the Trustee, "[b]ut for the reclamation work of the Trustee as to the permitted sites, the Jenkinses would be required to complete the reclamation using their own funds or the Certificates of Deposit.  The reclamation of the permitted sites by the Trustee is a benefit bestowed upon the Jenkinses. . . . [And to] allow the Jenkinses to retain the benefit of the Trustee's reclamation efforts would be unjust.[47]

The right to restitution under the doctrine of unjust enrichment is grounded in

---

[45] Although the Trustee has not raised the issue, the Court notes that AFI's claim asserted in the Cabanas lawsuit may be a commercial tort claim for purposes of Article 9 of the Uniform Commercial Code.  *See* K.S.A. 2011 Supp. 84-9-102(a)(13).  If so, filing a UCC-1 financing statement might have been required to perfect a security interest in the judgment.  *See* K.S.A. 2011 Supp. 84-9-310(a).

[46] Dkt. 89 at 50.

[47] *Id.*

35

principles of equity.[48]  "The obligation upon which the right to recover is based is created and imposed by law to prevent unjust enrichment at the expense of another."[49]  One of the basic elements of a claim based upon the theory of unjust enrichment is that the defendant's acceptance or retention of a benefit would occur "under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value."[50]

The Court agrees that, assuming the Trustee completes the reclamation of AFI's three permitted sites to the satisfaction of the State of Missouri, the Jenkinses will benefit since the bonds posted to assure such reclamation will be released and the Jenkinses will be entitled to the proceeds of the Certificates of Deposit.  While as a first impression, this may appear inequitable, a closer examination convinces the Court that there would be no inequitable retention of a benefit conferred on the Jenkinses upon which to base the equitable relief requested by the Trustee.

The obligation to complete the reclamation is AFI's, not the Jenkinses.  If the bankruptcy had not been filed, AFI would have had the proceeds of the Cabanas Lawsuit with which to complete the reclamation, after which the Certificates of Deposit would have been released to the Jenkinses.  Assuming AFI did not complete the reclamation,

---

[48] *Haz-Mat Response, Inc. v. Certified Waste Services Ltd*, 259 Kan. 166, 178, 910 P.2d 839, 847 (1996).

[49] *Id*.

[50] *J.W. Thompson Co. v. Welles Products Corp.*, 243 Kan. 503, 512, 758 P.2d 738, 745 (1988).

36

which is likely, the State of Missouri probably would require forfeiture of the bonds, and the Certificates of Deposit would not be released to the Jenkinses. But even so, the Court cannot conclude that the reclamation obligations would be personal liabilities of the Jenkinses, since there is nothing in the record indicating that the bonds or anything else obligate the Jenkinses personally to complete reclamation upon the default of AFI.

Because of the bankruptcy of AFI, the Trustee is completing the Debtor's reclamation obligations.[51] In doing so, the Trustee is using the proceeds of the judgment in the Cabanas Lawsuit, which are assets of AFI. Assuming completion of the reclamation and release of the bonds, the Certificates of Deposit will become the Jenkinses' property. But the benefit to the Jenkinses will be an indirect result of the Trustee's completion of AFI's reclamation obligations using AFI's own funds. It would not be fair to require forfeiture of the Jenkinses' interests in the Certificates of Deposit to compensate the bankruptcy estate for completion of the Debtor's reclamation obligations. On the other hand, if the judgment proceeds available to the Trustee prove insufficient to complete the reclamation, the State should then look to the reclamation bonds to fund the remainder of the reclamation, and the Certificates of Deposit securing those bonds would not be released to the Jenkinses.

The Trustee has not shown that the Jenkinses will be unjustly enriched if the Trustee completes the reclamation and the Certificates of Deposit are released. The Court

---

[51] It is the unsecured creditors of the estate whose shares of estate assets are being reduced by the administrative costs of the reclamation, but they have not objected to the Trustee's undertaking the reclamation.

37

therefore denies the relief sought by the Trustee in Count III of the Complaint.

**IV.    The Trustee is not entitled to an accounting from W.K. Jenkins of prepetition revenues of AFI and Cimarron.**

In Count IV the Trustee prays for an order requiring W.K. Jenkins to account to the Trustee for all revenues, income, and proceeds received by Cimarron and AFI from 1999 through the date of filing of this bankruptcy action.  But the Trustee fails to provide any legal or factual basis for the request, or to identify any information which is likely to be revealed.  And the trial testimony of W.K. Jenkins made clear any such order would likely result in no information.

**V.    The Trustee's objection to the Jenkinses' proof of claim is sustained.**

In Count V, the Trustee seeks an accounting from the Jenkinses on their claim on the grounds that the proof of claim "lacks sufficient documentation or proof of a valid claim (i) in the amount of the claim asserted; (ii) the consideration received by AFI; and/or (iii) the secured nature of the claim asserted."[52] Count VI, entitled "Objection to Jenkins claim," makes exactly the same allegations.  The Court will therefore analyze these two counts together.

First,  the Trustee argues that the Jenkinses have not provided sufficient documentation to prove the amount of their claim.  The Court agrees.  If an objection is made to a proof of claim, "the creditor has the ultimate burden of persuasion as to the

---

[52] Dkt. 89 at 54.

validity and amount of the claim."[53]  The Jenkinses have not fulfilled that burden.

Although the record is sufficient for the Court to conclude that some transfers were made

by the Jenkinses to AFI, neither the attachments to the proof of claim nor the trial

evidence is sufficient for the Court to determine the amount owed to the Jenkinses, if their

transfers to AFI are not recharacterized as equity.  The Jenkinses' claim is subject to

denial on this basis alone.

Next, the Trustee argues that the funds advanced to AFI were not for reasonably

equivalent value because the transfers were for the benefit of the Jenkinses' investment in

AFI and Cimarron, not for the benefit of AFI.  The Trustee's arguments in support of this

position are essentially a restatement of the arguments in support of recharacterization

and subordination, which have been addressed above.  The Court's findings will not be

repeated.  The fact that the Jenkinses' motivation for the transfers to Cimarron for the

benefit of AFI was to protect their investment in the Certificates of Deposit is not a

sufficient basis to deny the claim.

The Trustee also asserts that the assignment of $3 million of the judgment entered

in the Cabanas Lawsuit to the Jenkinses fails for lack of consideration. The document

entitled "Assignment of Chosen [sic] in Action," dated March 1, 2003, does not recite the

consideration.  The promissory note of the same date, in the principal amount of

$2,370,761.00, states it is a renewal of the notes dated December 6, 1999, November 6,

---

[53] *In re Harrison*, 987 F.2d 677, 680 (10th Cir. 1993).

2000, and October 11, 2001; since the total principal amount of those notes was $2 million, the extra $370,761.00 on this note was presumably accrued interest. It refers to the Cabanas Lawsuit by stating: "[t]his note shall be paid in full upon reclamation bond release from the State of Missouri or proceeds from lawsuit filed in Federal Court case no. 02CV1182."[54] The parties stipulated: "W.K. Jenkins directed Pommier to execute the Assignment to help secure Jenkins' investment in AFI and Cimarron in the completion of the reclamation and the ultimate release of the Bonds/Certificates of Deposits to Jenkins."[55]

As to the consideration for the assignment, the Defendants' counsel argues that the assignment was offered to induce the Jenkinses to continue loaning money to AFI.[56] This position is supported by W.K. Jenkins' testimony that at the time of the assignment, it was known that AFI would need additional funds for the litigation, and that after the assignment, he advanced another $1 million.[57] Under Kansas law, consideration is defined as "some right, interest, profit, or benefit accruing to one party"[58]; "[a] promise is without consideration when the promise is given by one party to another without anything

---

[54] Def. Exh. 23.

[55] Dkt. 63 at 6, stip. ¶ 36.

[56] Defendants' Reply Brief at 18. (The brief was filed in two parts, Dkt. 91 and Dkt. 92, and this argument appears in Dkt 92, at 8).

[57] Tr. Vol. III. at 76 and 97.

[58] *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 32, 59 P.3d 1003, 1014 (2002) (*quoting* 17A Am. Jur. 2d Contracts § 113, p. 129).

40

being bargained for and given in exchange for it."[59]  The consideration need not have a

value equivalent to the benefit received.  "A consideration legally sufficient for any

purpose at all, even the slightest consideration, is sufficient for whatever purpose the

parties seek to use it."[60]  The Court rejects the Trustee's position that the assignment of

the Cabanas Judgment as security for funds allegedly loaned to AFI was without adequate

consideration.  However, as found above, the Court has ruled that the assignment as

security must be subordinated and transferred to the estate.

**CONCLUSION.**

To summarize, the Court finds:  (1) the Jenkinses' claim for $3,823,862.92 for

payment of three promissory Notes, plus interest, is disallowed since the transfers alleged

to be consideration for the Notes should be recharacterized as equity contributions; (2) the

Jenkinses' claim for $487,298.62 for "money" related to reclamation and accounts for

Dan Card and Pat Miller is disallowed since the transfers alleged to be consideration for

the claim should be recharacterized as equity contributions; and (3) the Jenkinses' claim

to $3 million of the proceeds of the Cabanas Lawsuit allegedly assigned as security for

the foregoing claims is set aside since the Jenkinses do not hold an allowed claim which

the assignment secures.  Alternatively, the Court finds the Jenkinses have not sustained

their burden of proof as to the validity and amount of their claims.  In addition, if the

---

[59] *Id.* (citing Corbin on Contracts § 5.20 (rev. ed. 1995)).

[60] 17A Am. Jur. 2d Contracts § 115, available on Westlaw in database AMJUR CONTRACTS (updated Nov. 2012).

41

claims were proven and not recharacterized as equity, the Court would hold that the Jenkinses are the holders of unsubordinated, unsecured claims for the amount of the transfers, but the alleged assignment of the $3 million of the proceeds of the Cabanas Lawsuit as security for those claims would be subordinated and set aside and transferred to the estate.

The value represented by the Certificates of Deposit is not included in the proof of claim, since the Certificates were assigned to the Jenkinses, not AFI. The Trustee's claim that the Jenkinses' interests in the Certificates should be subject to a lien in favor of the estate for the reclamation expenses incurred by the Trustee is denied.

The foregoing constitute Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure which makes Rule 52(a) of the Federal Rules of  Civil Procedure applicable to this proceeding.  A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 7058 which makes  Federal Rule of Civil Procedure 58 applicable to this proceeding.

**IT IS SO ORDERED.**

**# # #**